**Joanna HUBICKI, Plaintiff,**

v.

**AMTRAK NATIONAL PASSENGER RAILROAD COMPANY, and the Travelers Insurance Company, Defendants.**

**No. CV–91–4409.**

United States District Court,
E.D. New York.

Dec. 11, 1992.

Joanna Hubicki, pro se.

Mark S. Landman, Siff, Rosen, New York City, for Amtrak.

Chorpenning, Good, Carlet & Garrison, New York City, for Travelers.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff *pro se* Joanna Hubicki brings this action against National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") and The Travelers Insurance Company ("Travelers"). Plaintiff alleges that Amtrak, her former employer, and Travelers, the health care insurance company under which she was covered while employed, denied her claims for medical benefits without written explanation. In addition, she alleges that defendants violated the notice provisions of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), which amended the Employment Retirement Income Security Act ("ERISA"), by failing to provide her with certain information that she requested. Plaintiff invokes jurisdiction under ERISA and seeks compensatory and punitive damages.

Based on the facts recounted below, defendant Amtrak moves for summary judgment, and defendant Travelers moves to dismiss under Rule 12(b)(6). Plaintiff has filed a response in the form of a letter to which she attaches a number of exhibits. As an initial matter, since both plaintiff and Travelers have submitted matters outside the pleadings (in the form of affidavits and exhibits), this court treats Travelers' motion to dismiss solely as one made for summary judgment under Rule 56.

For the reasons detailed below, the motions are granted and all claims against both defendants are resolved in their favor. In reaching this decision, however, this court is mindful of the frustration plaintiff has expressed throughout this action; in light of the failure by both Travelers and Amtrak to explain plaintiff's policy benefits to her in a lucid and informative fashion, such frustration clearly was justified. This entire litigation might have been avoided had Travelers sent explanatory letters to plaintiff at the point that her employment ended, rather than waiting until the Magistrate Judge suggested doing so. This court expresses its hope that the lesson underlying this case will not fade with this decision.

## DISCUSSION

Plaintiff is a former Amtrak employee who resigned on April 30, 1991 as part of a settlement agreement for an on-the-job injury. (Defendant Amtrak's 3(g) Statement ¶ 3 & Exh. B)[1] Although plaintiff did not resign officially until this date, it appears that a "disabling disease" prevented her from working for Amtrak as early as June of 1989. (Affidavit of Dede Volner, Technical Advisor of the Travelers Insurance Company, ¶ 5) During the term of her

---

1. Amtrak sets the resignation date as April of 1989; Travelers states that she ceased her employment in June. Plaintiff states that she did not resign until April 30, 1991.

employment by Amtrak, plaintiff participated in the Railroad Employee National Health & Welfare Plan (the "Plan"),[2] contract no. GA–23000, through which eligible employees receive health and disability benefits. Travelers administers this Plan. (Defendant Amtrak's 3(g) Statement ¶ 2)

Chapter III of the Plan discusses eligibility for benefits (P 15) and divides those persons who are considered "Qualifying Employees" into two categories: persons in active employment and persons not in active employment but nevertheless covered until certain conditions are met or certain events occur. The latter group includes employees who are either retired, disabled, furloughed, suspended, dismissed, or under Compensation Maintenance Agreements. (P 16–19) As to disabled employees, coverage extends for so long as the disability is the only reason that the employee cannot perform work in her regular occupation; even then, coverage ceases after the disabled employee has failed to render compensated service or receive vacation pay for one calendar year. (P 16–17) In all cases described above coverage ends on the date the employment relationship is terminated for reasons other than retirement. (P 19)

Another section of the Plan, entitled "Eligibility For Employee Health Benefits; Benefits After Coverage Ends" (the "Premium Waiver provisions"), provides that after an eligible participant's coverage ends, benefits *continue* to be payable for injuries that occurred and sicknesses that commenced while that participant was covered. (P 24) This coverage extends until the earliest of the following:

—three months from the date your coverage ends, unless at the end of that three-month period you are under treatment by a licensed physician and pre-

vented by a disability from performing work in your last regular occupation and any other comparable occupation....

—when you fail to render compensated service or receive Vacation Pay for One Calendar Year (Two Calendar Years for Poliomyelitis and Major Medical Expense Benefits.)

(P 24; Letter from Travelers to Hubicki, April 28, 1992, Exh. C to Amtrak's 3(g) Statement)

In her complaint, plaintiff alleges that after the date of her resignation she was denied her employee health insurance coverage. She also complains that she never received information pertaining to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1166. Defendants make the following arguments in favor of summary judgment on both claims: first, that plaintiff has received payment for *all* of the claims she filed regarding her continuing disability; and second, that they timely sent plaintiff COBRA information and that the coverage she did receive under the Premium Waiver provisions exceeded any possible benefits she would have received under COBRA.

### I. *Premature Termination of Benefit Coverage*

█ The precise nature of the injury for which plaintiff seeks redress is not entirely clear. In her complaint, plaintiff asserts that she is in physical pain and that this pain could be ameliorated by proper medical and dental attention that she cannot now afford. And in her response to defendants' motions for summary judgment,[3] plaintiff states:

In my original complaint I stated that Amtrak had misreported the circumstances of my resignation. Amtrak av-

---

**2.** Although defendant Amtrak has not provided the court with a copy of the Plan, both Travelers and Hubicki have attached copies to their papers, and the former has included an affidavit by a technical supervisor of the Plan as well. All cites to pages of the Plan are denoted by P ____. Amtrak also has attached as Exhibits C & D to its 3(g) statement letters from Travelers to plaintiff which incorporate the provisions of the Plan discussed in this memorandum. These

two letters were written at the direction of Magistrate Judge Caden: the first, dated April 28, 1992, responds to plaintiff's inquiries of March 6, 1992; the second, dated June 6, 1992, responds to plaintiff's letter of May 26, 1992.

**3.** In this response, plaintiff also requests leave to amend her complaint to demand "treble damages of $3,000,000 to seriously discourage the defendants from such actions in the future."

ers that I resigned voluntarily. My resignation states that I resigned because of injuries. (Exhibit C)

According to pamphlet 1B–2 of the U.S. Railroad Retirement Board, page four (Exhibit D), if I had not the choice to remain in service, my resignation was involuntary. By reporting my resignation as voluntary Amtrak has stolen from me my employment rights. (Exhibit D, page 4)

Exhibit D to which plaintiff refers is a pamphlet entitled "Railroad Retirement and Survivor Benefits"; it discusses annuities awarded to employees and their spouses at retirement—matters about which plaintiff does not seem to be complaining.

Plaintiff can be interpreted as arguing that 1991 (and *not* 1989) is the date on which she ceased to be a "qualifying employee," in which case she deserves a longer period of benefits than Travelers concedes; plaintiff alludes to this argument by stating that "I had not resigned in 1989." Travelers, on the other hand, states that plaintiff was entitled to and received basic and major medical benefits through July 31, 1989 under the Plan; under the Premium Waiver provision, Travelers advises, plaintiff remained eligible for these benefits for three months from the date her coverage otherwise would end—October 31, 1989. (Volner Aff. ¶¶ 5–6) Since neither plaintiff nor defendants elaborate on the circumstances surrounding plaintiff's cessation from work in 1989, at first glance it is not clear why plaintiff's coverage under the Plan *should* terminate on that date. In other words, if plaintiff was "disabled" in June of 1989, the Plan seems to provide that she continues as a Qualifying Employee for the next calendar year—until December 1990—at which point coverage ends and the Premium Waiver Provisions kick in. Conversely, if plaintiff voluntarily stopped working at Amtrak in June of 1989, coverage should end then, just as Travelers seems to state. (*P* 15) This issue is further confused by the 1991 agreement's lack of clear intent and effect: Does this agreement mean that plaintiff was "disabled" as of the date she signed? Does it mean that plaintiff's coverage

ceased as of that date? Or does the resignation have no effect on benefits?

Although neither Travelers nor Amtrak addresses these questions directly, upon close examination of the benefits plaintiff in fact received, it appears that plaintiff *was* considered "disabled" in June 1989—which means that her coverage under the Plan extended to December of 1990, and her coverage under the Premium provisions kicked in thereafter. This fact comes from the following language in the Affidavit of Dede Volner:

> Travelers received further documentation confirming Hubicki's disability through May 22, 1991. Based on this information, Hubicki's Basic and Major Medical coverage was extended through December 31, 1990 and Major Medical Benefits continued through May 22, 1991 under the Premium Waiver Provisions.

(*See* Volner Aff. ¶ 10) The import of this discovery is that if plaintiff is complaining that her benefits were cut short, her complaint cannot rest on an assertion that Travelers and Amtrak failed to grant her "disabled" status starting in 1989.

Plaintiff's claim for lost benefits is also countered by the fact that she *has received payment* for all of her submitted expenses to date. Specifically, plaintiff's physician sent his first letter to Travelers on June 4, 1990, and plaintiff's benefits were extended through that date. (Volner Aff. ¶ 9) A second letter confirmed a disability through May 22, 1991; major medical benefits were extended through that date under the Premium Waiver provisions although the Plan allowed basic coverage to extend only through December 31, 1990. (Volner Aff. ¶ 10) A third disability statement was sent on November 12, 1991, and major medical again was extended under the Premium Waiver provisions. (Volner Aff. ¶ 11)

Sometime after November 27, 1991, Travelers received verification that Hubicki received vacation pay in January 1990. (Volner Aff. ¶ 12) The significance of this fact was that it extended the length of time in which basic and major medical benefits would be provided to Hubicki under the

Plan so long as disability statements were provided. On March 3, 1992, Travelers received documentation that Hubicki was disabled in February 1992, and it extended plaintiff's basic coverage through December 31, 1991 and major coverage through February 1992. (Volner Aff. ¶ 13) Travelers has received further disability statements and has extended coverage accordingly. (Volner Aff. ¶ 14) Furthermore, Travelers avers that it has paid all benefits due plaintiff under the Plan and will continue to provide coverage through December 31, 1992, the maximum period of time in which benefits are available under the Premium Waiver provision, so long as plaintiff continues to provide the requisite documentation. (Volner Aff. ¶ 15)

Payment for submitted medical expenses may have taken some time in arriving. However, defendants point out that plaintiff acknowledged receipt of all these payments at a May 5, 1992 conference before Magistrate Judge Caden. In other words, as plaintiff provided Travelers with medical documentation attesting to her continuing disability, Travelers paid those bills; plaintiff therefore extended her coverage for a total of 36 months. There appears to be no reason why plaintiff is or was entitled to greater benefits than she in fact received.[4] Accordingly, defendants' motions for summary judgment on any claims regarding benefits termination should be resolved in their favor. Since the COBRA cause of action does not affect plaintiff's employer, there are no outstanding claims to discuss against Amtrak.

## II. COBRA Notice

■ As mentioned above, plaintiff also complains that Travelers failed to send her information about her "COBRA" rights. COBRA was enacted in 1985 to provide employees who had been covered by an employment-related group health care plan with the opportunity to elect group rate continuation of coverage under the plan in the face of some "qualifying event"—job loss or hour reduction. 29 U.S.C. § 1161;

Local 217, Hotel & Restaurant Employees Union v. MHM, Inc., 976 F.2d 805, 809 (2d Cir.1992) (discussing COBRA purpose and requirements). COBRA amended ERISA to require health care sponsors to provide such coverage and to notify their covered employees of election rights under the Act. 29 U.S.C. § 1161; see also id. § 1166 (notice requirements).

■ The notification requirements of COBRA are clear. In the event of a covered employee's termination, an employer must notify the administrator of the group health care plan within thirty days, id. § 1166(a)(2); the administrator then has fourteen days to notify the qualified beneficiary of her right to continue coverage, and this period may be longer if the plan is a multiemployer group health care plan and it so provides. Id. § 1166(a)(4). An employer or plan administrator who sends proper notice to the covered employee's last known address is deemed to be in good faith compliance with COBRA's notification requirements. Truesdale v. Pacific Holding Co./Hay Adams Div., 778 F.Supp. 77, 81–82 (D.D.C.1991); see also Conery v. Bath Associates, 803 F.Supp. 1388, 1398 (N.D.Ind.1992) ("Courts that have considered [how notice of eligibility must be communicated] have determined that a good faith attempt to comply with a reasonable interpretation of the provision is sufficient.").

■ A qualified COBRA beneficiary may elect continuation coverage within sixty days of the qualifying event or of notice of the qualifying event, whichever is later. Local 217, 976 F.2d at 809 (citing 29 U.S.C. § 1162(3)); Communications Workers of America v. NYNEX Corp., 898 F.2d 887, 888–889 (2d Cir.1990) (discussing COBRA); see also Gaskell v. Harvard Coop. Soc., 762 F.Supp. 1539, 1541 (D.Mass.1991) ("Unless and until such notice is given to the employee, the continuation period cannot begin to run."). Continued coverage extends for a maximum period of eighteen months. 29 U.S.C. § 1162(2)(A). Travelers

---

**4.** Plaintiff also states that "Amtrak has declined to acknowledge that they acted illegally in the matter of my resignation." By calling into question the 1991 agreement, plaintiff raises a new issue not mentioned in the complaint and therefore not properly before this court.

asserts that it sent plaintiff a package containing information pertaining to COBRA, including a Notice of Qualifying Event form, on September 28, 1989. (Letter from Travelers to Hubicki, June 28, 1992, Exh. C to Amtrak's 3(g) Statement) The insurance company supports this assertion by providing documentation—in the form of a "Cobradex Employee Record" for plaintiff—attached to this memorandum and as Exhibit B to the Volner Affidavit; this record is maintained by Travelers in the ordinary course of its business. (Volner Aff. ¶ 8)[5]

■ Plaintiff confirms receipt of notice by attaching as Exhibits A & B two documents that she says she received without any explanation: a Medicare handbook and a document which appears to me to be the requisite COBRA notification. While plaintiff states that this second document "does not seem to apply to my particular circumstances," the document's contents belie this assertion. The third page of the pamphlet discusses continuation of health and dental coverage for employees who cease their employment "for any reason *other than* gross misconduct." The COBRA notice of September 1989 appears to be timely.

■ Travelers argues that even if its notice somehow was deficient, plaintiff in fact received more benefits under her existing insurance policy than she would have received under COBRA; the latter would have afforded her only 18 months of coverage, and she would have been responsible for the premium. One court has held that additional coverage—even if mistaken—does not affect the notice obligation. *See Gaskell*, 762 F.Supp. at 1542 (fact that employer "gratuitously, or even mistakenly, paid for [its employee's] health plan coverage throughout the period of his disability leave and for nearly six months following his resignation ... cannot, in retrospect, be considered as somehow obviating the notice requirement or altering the continuation period."). But even measuring plaintiff's potential COBRA coverage from when she actually received notice *or,* more generously, from the last possible date of any qualifying event (April 1991),

plaintiff received more than 18 months coverage. She also failed to make a timely election. Thus, with respect to plaintiff's second claim—that she never received timely COBRA information—summary judgment in favor of Travelers is appropriate.

## CONCLUSION

Worthy of repetition is this action's clear lesson that insurance companies, health care providers, and employers should explain more clearly and precisely the benefits to which covered employees are entitled—especially upon a "qualifying event." In this case, letters sent after litigation commenced indicated to plaintiff her current benefits status; however, those communications, sent only at direction of the court, arrived too late to make a difference.

In sum, for all of the reasons discussed above, summary judgment in favor of Travelers and Amtrak is hereby granted.

SO ORDERED.

---

**5.** Plaintiff attaches a copy of this statement to her reply on this motion.