USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1024 DAVID AND CAROLYN GASKELL, Plaintiffs, Appellants, v. THE HARVARD COOPERATIVE SOCIETY, ET AL., Defendants, Appellees. _____________________ No. 93-1102 DAVID AND CAROLYN GASKELL, Plaintiffs, Appellees, v. THE HARVARD COOPERATIVE SOCIETY, ET AL., Defendants, Appellants. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Torruella, Oakes* and Cyr, Circuit Judges. ______________ ____________________ ____________________ *Of the Second Circuit, sitting by designation. Norman H. Jackman with whom Martha M. Wishart and Jackman & Roth _________________ _________________ _______________ were on brief for plaintiffs. Francis J. Lawler with whom Robert M. Shea and Peabody & Brown __________________ _______________ _______________ were on brief for defendants. ____________________ August 25, 1993 ____________________ 2 CYR, Circuit Judge. This case presents several impor- CYR, Circuit Judge. _____________ tant issues relating to group health plan "continuation coverage" under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 et seq., as amended by the Comprehen- __ ____ sive Omnibus Budget Reconciliation Act of 1985 ("COBRA"), P.L. 99-272, 100 Stat. 222 (1986). The district court ruled that plaintiff Carolyn Gaskell, wife of "covered employee" David Gaskell, was entitled to three years' continuation coverage under COBRA, dating from her election of continuation coverage under an ERISA employer-sponsored group health insurance plan. The court denied a related subrogation claim brought by the Gaskells in the name of their current insurer. The district court rejected plaintiffs' requests for statutory penalties, punitive damages, and attorney fees. I I BACKGROUND BACKGROUND __________ David Gaskell was a longtime employee of the Harvard Cooperative Society ("Coop"), which provided Blue Cross group medical plan coverage for its employees and their families. On January 14, 1987, David went on full disability leave, during which he received full salary and benefits, including Blue Cross group plan coverage for himself and Carolyn, apparently at Coop expense. More than a year later, on February 29, 1988, still unable to work, David terminated his employment with the Coop, 3 retroactive to January 14, 1988. Under COBRA, an employer that sponsors a group health insurance plan must offer employees and "qualified beneficia- ries," including spouses and dependent children, the opportunity to continue their health insurance coverage, at group rates but at their own expense, for at least eighteen months after the occurrence of a "qualifying event" and notice to the affected employee. See 29 U.S.C. 1161-68. A "qualifying event" in- ___ cludes a "termination . . . , or reduction of hours, of the covered employee's employment" which, "but for the continuation coverage under this part, would result in the loss of coverage of a qualified beneficiary." Id. at 1163(2). In April 1988, ___ following David's resignation, the Coop sent a COBRA notice informing him of his statutory right to continue his Blue Cross group plan coverage for eighteen months, beginning July 1, 1988. On April 26, 1988, David elected "continuation coverage" for himself and Carolyn. Within a year, the Gaskells learned that David would become eligible for Medicare benefits beginning July 1, 1989. Although Medicare eligibility would render David ineligible for "continuation coverage" after July 1, 1989, see id. at 1162(2) ___ ___ (D)(ii), it also would serve as a new "qualifying event," see id. ___ ___ at 1163(4), and make Carolyn eligible for three years' "contin- _______ uation coverage" under the Coop group plan with Blue Cross. See ___ id. at 1162(2)(A)(ii). At about the same time, however, the ___ Gaskells learned that the Coop intended to terminate its Blue 4 Cross group plan and adopt a self-funded insurance plan adminis- tered by Benefit Plans Northeast ("BPN"), effective July 1, 1989. As the new BPN-administered plan would not be "convertible" to individual coverage at the end of Carolyn's continuation coverage period, the Gaskells decided to exercise their "conversion option" under the Coop Blue Cross group plan. Accordingly, in June 1989, prior to the changeover in Coop plan administration, the Gaskells asked the Coop to "convert" Carolyn's group cover- age, effective July 1, to individual direct-pay coverage under the Blue Cross Managed Major Medical Plan. The coincidence of David's Medicare eligibility, Carolyn's application for conversion to an individual policy, and the Coop's change to a self-funded plan, engendered considerable confusion among the parties. On August 30, 1989, Blue Cross began returning the Gaskells' medical bills unpaid. Blue Cross contended that its obligation to provide Carolyn with individual direct-pay coverage had terminated on June 30, 1989, concurrently with the expiration of its group plan arrangement with the Coop, and that any Blue Cross coverage beyond that date would be available only on the terms imposed on new applicants, viz., a ____ 240-day waiting period and an exclusion for preexisting medical conditions. Finding these terms unacceptable, the Gaskells sought to continue Carolyn's coverage under the Coop group plan, then being administered by BPN. BPN refused, asserting that the Coop's obligation to provide "continuation coverage" had termi- nated before the change in plan administration took place on 5 July 1, 1989. After several unsuccessful efforts to obtain satisfactory coverage, the Gaskells brought the present action against the Coop, BPN, James Argeros (Coop president), Leonard Cutler (BPN president), and Blue Cross, alleging violations of COBRA and Massachusetts law.1 On January 31, 1991, the Gaskells settled their claims against Blue Cross, in return for, inter alia, individual cover- _____ ____ age for Carolyn under the Blue Cross Managed Major Medical Plan retroactive to July 1, 1989. The retroactive coverage was subject to a twenty percent co-payment. As part of the settle- ment, Blue Cross assigned the Gaskells its subrogation rights against the remaining defendants. The Gaskells then amended their complaint to add a subrogation claim against the Coop and BPN, relating to the eighty percent of Carolyn's medical expenses which Blue Cross had paid under the terms of Carolyn's individual Blue Cross policy. On May 17, 1991, acting on cross-motions for judgment on the pleadings, the district court ruled that BPN and the Coop were legally responsible under COBRA for providing "continuation coverage" of Carolyn's medical expenses between July 1, 1989 and July 1, 1991. The court rejected the Gaskells' demand for "extra-contractual" damages, and limited compensatory damages to the twenty percent co-payment amount not retroactively covered by Carolyn's individual Blue Cross policy, at the same time reserv- ____________________ 1The Gaskells later waived their state-law claims against all defendants. 6 ing decision on their subrogation claim for the remaining eighty percent of Carolyn's medical expenses. See Gaskell v. Harvard ___ _______ _______ Cooperative Soc'y, 762 F. Supp. 1539, 1543-1544 & n.8 (D. Mass. _________________ 1991). Shortly thereafter, in an unpublished order, the district court granted summary judgment against the Gaskells on their subrogation claim, ruling that Blue Cross "possessed no rights pursuant to the Subscriber Certificate against [the Coop] for reimbursement of any monies paid towards [Carolyn's] medical bills." The individual claims against Leonard Cutler, as "plan administrator," were dismissed on October 6, 1992. The parties stipulated to the dismissal of the remaining count against BPN, and final judgment was entered on December 14, 1992. This appeal followed. II II DISCUSSION DISCUSSION __________ Standards of Review Standards of Review ___________________ We review a grant of summary judgment de novo, employ- __ ____ ing the same criteria incumbent upon the district court. See ___ Vanhaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st _________ _______________________________ Cir. 1993); High Voltage Eng'g Corp. v. Federal Ins. Co., 981 __________________________ _________________ F.2d 596, 598 (1st Cir. 1992); Pedraza v. Shell Oil Co., 942 F.2d _______ _____________ 48, 50 (1st Cir. 1991), cert. denied, 112 S.Ct. 993 (1992). _____ ______ Summary judgment is appropriate where "the pleadings, deposi- tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party 7 is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Vanhaaren, 989 F.2d at 3; Canal Ins. Co. v. Benner, ___ _________ _______________ ______ 980 F.2d 23, 25 (1st Cir. 1992). Similarly, on plenary review of a district court judgment on the pleadings under Rule 12(c), all material allegations in the complaint are credited in the light most favorable to the plaintiff, see International Paper Co. v. ___ _______________________ Jay, 928 F.2d 480, 482 (1st Cir. 1991). A dismissal on the ___ pleadings will be upheld only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claims which would entitle [it] to relief.'" Id. at 482-83 ___ (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). ______ ______ Statutory Background Statutory Background ____________________ COBRA was enacted in 1986, as a legislative response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay," H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 _________ __ U.S.C.C.A.N. 579, 622.2 In "an effort to provide continued ____________________ 2Although COBRA has been amended several times, see, e.g., ___ ____ Tax Reform Act of 1986, P.L. 99-514 (October 22, 1986), 1895- (d); Technical and Miscellaneous Revenues Act of 1988, P.L. 100- 647 (November 10, 1988), 3011(a); and Omnibus Budget Reconcili- ation Act of 1989 ("OBRA"), P.L. 101-239 (December 19, 1989), 6703-6710, 6801, 7862(c), 7891(d), except as otherwise indi- cated we refer to the January, 1987 version as "COBRA." For a fuller description of COBRA's enactment, see Thomas H. Somers, COBRA: An Incremental Approach to National Health Insur- _________________________________________________________ ance, 5 J. Contemp. Health L. & Probs. 141, 141-2 (1992) (noting ____ that COBRA's "continuation coverage" provisions were enacted "without deliberation . . . , in the process amending three distinct statutes," and "invit[ing] a fair amount of regulatory confusion."). 8 access to affordable private health insurance for some of these individuals," H.R. Rep. No. 241, at 44, without increasing the "staggering budget deficits now facing the United States," see S. ___ Rep. No. 146, 99th Cong., 2nd Sess. 3, reprinted in 1986 U.S.C.- _________ __ C.A.N. 42, 43, COBRA compels employers that sponsor certain group health plans to provide "qualified beneficiaries" with the option of receiving self-paid "continuation coverage," at no more than 102% of group rates, for eighteen or thirty-six months after the occurrence of a "qualifying event" which would otherwise result in a termination of coverage. See 29 U.S.C. 1161(a), 1162(2)- ___ (A).3 The "continuation coverage" required by COBRA must be "identical to the coverage provided under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred," 29 U.S.C. 1162(1), and "[i]f coverage is modified under the plan for any group of similarly situated beneficiaries, such coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries under the plan pursuant to [COBRA] . . . ." Id. ___ An employer which fails to provide elective "continuation cover- age" under the terms of the statute is subject to unfavorable tax ____________________ 3The period of entitlement to "continuation coverage" may be extended or shortened, depending on the occurrence of certain events within the preceding coverage term. See, e.g., 29 U.S.C. ___ ____ 1162(2)(A)(ii) (occurrence of additional qualifying event, within initial period of "continuation coverage," may extend term of COBRA coverage); id. at 1162(2)(A)(v) (covered employee's ___ eligibility for "continuation coverage" terminates with Medicare eligibility). 9 treatment, see 26 U.S.C. 4980B (1989), amending 26 U.S.C. ___ ________ 162(i)(2) (1988), and to civil suit by affected "qualified beneficiaries," see 29 U.S.C. 1132(a). A plan administrator ___ which fails to provide a "qualified beneficiary" with timely notice of her rights under COBRA is subject to personal liability not exceeding $100 per day. See 29 U.S.C. 1132(c)(1); see ___ ___ generally Jeffrey D. Mamorsky, Employee Benefits Law: ERISA and _________ _________________________________ Beyond, 10.07 et seq. (2d ed. 1993) (discussing COBRA and ______ __ ____ subsequent amendments). The Gaskells' Coverage The Gaskells' Coverage ______________________ The Coop does not contest its obligation, under COBRA, to provide the Gaskells with "continuation coverage," at their election and expense, for a minimum of eighteen months after the occurrence of a "qualifying event." See 762 F. Supp. at 1541. ___ Instead, the Coop contends that the relevant "qualifying event" occurred on January 14, 1987, when David Gaskell first went on full disability leave, "reducing his hours" from forty per week to zero. See 29 U.S.C. 1163 ("reduction of hours . . . of the ___ covered employee's employment" as potential qualifying event). On the Coop's reasoning, therefore, its eighteen-month "continua- tion coverage" obligation expired on July 14, 1988, and the Coop had no legal duty to continue Carolyn's coverage further based on David's subsequent Medicare eligibility on July 1, 1989. We agree with the Coop's reading of the statute, but find no record evidence to support its allegation that group plan coverage terminated as a result of David's disability leave on January 14, 10 1987. Accordingly, we must remand for further fact finding on this issue. Under COBRA, "the term 'qualifying event' means, with respect to any covered employee, any . . . [termination or reduc- tion in hours] which, but for the continuation coverage required _____ ___ ___ ___ ____________ ________ ________ under this part, would result in the loss of coverage of a _____ ____ ____ _____ ______ __ ___ ____ __ ________ __ _ qualified beneficiary . . . ." 29 U.S.C. 1163 (emphasis _________ ___________ added). As the district court noted, see 762 F.Supp. at 1542, ___ this statutory language offers no explicit guidance in determin- ing the relevant "qualifying event" where, as here, the em- ployee's termination or reduction in hours does not coincide with the "loss of coverage" under the employer's plan. In these circumstances, the district court elected to view the "qualifying event" as "the point at which [the employee] experience[d] a loss __________ _ _ ____ of coverage as a consequence of the reduction in hours." Id. at __ ________ ___ 1543 (emphasis added). Other courts, by contrast, have measured the eighteen-month period from the event itself, viz., the ____ ___ _____ ______ ____ employee's termination or reduction in hours, so long as that event "eventually resulted in the loss of . . . health coverage." __________ See, e.g., Phillips v. Riverside, Inc., 796 F. Supp. 403, 411 ___ ____ ________ ________________ (E.D. Ark. 1992) (holding that employer's "gratuitous" provision of three months' continued coverage must be credited towards employer's eighteen-month COBRA "continuation coverage" obliga- tion once belated notice has been given to the employee); see _______ ___ also Hubicki v. Amtrak Nat. Passenger R. Co., 808 F.Supp. 192, ____ _______ _____________________________ 197 (E.D.N.Y. 1992) (noting, without resolving, possible alterna- 11 tive readings of statute). Since we agree with the district court that either reading is plausible, based on the statutory language, we consult the available legislative history. See Concrete Pipe & Prods., ___ _______________________ Inc. v. Construction Laborers Pension Trust, 113 S.Ct. 2264, 2281 ____ ___________________________________ (1993) ("we turn, as . . . in the usual case of textual ambigu- ity, to the legislative purpose as revealed by the history of the statute"); United States v. Alky Enterprises, Inc., 969 F.2d _____________ _______________________ 1309, 1314 (1st Cir. 1992) ("where the language of a statute is ambiguous on its face, we should look . . . to the legislative history in order to ascertain Congressional intent"); see gener- ___ ______ ally Stephen J. Breyer, On The Uses of Legislative History in ____ ________________________________________ Interpreting Statutes, 65 S. Cal. L. Rev. 845 (1992) (discussing _____________________ proper use of legislative history in ascertaining congressional intent where statute is ambiguous). COBRA's legislative history leads us to conclude that Congress intended an employee's eigh- teen-month period of continuation coverage to commence with the ________ ____ ___ event leading, under the terms of the plan, to loss of coverage, _____ _______ _____ ___ _____ __ ___ ____ __ ____ __ ________ rather than upon the loss of coverage itself. First, while the House Reports accompanying the various versions of the statute are silent or ambiguous on the issue,4 the "continuation coverage" provisions in the House bill were ____________________ 4See H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, 45, ___ reprinted in 1986 U.S.C.C.A.N. 579, 622-23 (no discussion of _________ __ issue); H.R. Rep. No. 320, 99th Cong., 2d Sess. 319-20, reprinted _________ in 1986 U.S.C.C.A.N. 756, 970-71 (noting, without elaboration, __ that 1163 "defines qualifying event"). 12 incorporated virtually without change into the final Conference bill,5 and the Report of the Senate Finance Committee, which accompanied the final Conference version, is reasonably explicit. It provides, in pertinent part, that: Th[e] 18-month period [of continuation cover- age] includes, and is not in addition to, any continuation period presently permitted under local law. Thus, for example, if the plan presently provides that dependent coverage ceases one month after the date of an em- ployee's death, the bill would require that beneficiaries be entitled to elect continu- ation coverage for up to 18 months following the date of death, not the 18-month period beginning with the actual cessation of cover- age one month after the employee's death. See S. Rep. No. 146, 99th Cong., 2d Sess. 3, 365, reprinted at ___ _________ __ 1986 U.S.C.C.A.N. 42, 324. We perceive no basis, in the legisla- tive history, for the Gaskells' proposed distinction between "blended" coverage and "stacked" coverage.6 Moreover, the Senate Finance Committee Report, referring to "any continuation ___ period presently permitted," see id. (emphasis added), appears to ___ ___ undermine the basis for such a distinction. Second, the Proposed Regulations issued by the Treasury Department, the only administrative interpretation of the statute ____________________ 5Compare Pub.L. 99-272 10001-02 with H.R. Conf. Rep. No. _______ ____ 99-543, at 162-72 (text of H.R. 3128, 10001-02 (rejected by the House, December 19, 1985)). 6As explained in the Gaskells' appellate brief, "blending" of coverage occurs when "the employer wishes to pay for the employee's coverage for part or all of the COBRA period," after giving timely notice to the employee of the occurrence of a qualifying event. "Stacking" of coverage occurs "when the employer provides coverage . . . for some period after termina- tion without complying with COBRA and then gives the notice." 13 proffered to date, appear to take a similar position. See Prop. ___ Treas. Reg. 1.162-26, 52 Fed. Reg. 22,716 (proposed Apr. 6, 1987; to be codified at 26 C.F.R. pt. 1), at Q&A-18 ("a loss of cover- age need not occur immediately after the event, so long as the loss of coverage will occur before the end of the maximum cover- age period"); see also id. at Q&A-39 ("The end of the maximum ___ ____ ___ coverage period is measured from the date of the qualifying event even if the qualifying event does not result in a loss of cover- ____ __ ___ __________ _____ ____ ___ ______ __ _ ____ __ ______ age under the plan until some later date") (emphasis added).7 ___ _____ ___ ____ _____ ____ _____ ____ The Proposed Treasury Regulations have not yet been finalized, are apparently on hold pending further revisions, see 56 Fed. ___ Reg. 53803-03 (1991), and, accordingly, are not authoritative. ___ _____________ See Oakley v. City of Longmont, 890 F.2d 1128, 1133 (10th Cir. ___ ______ _________________ 1989) (Treasury Department's interpretation of COBRA not authori- tative "[u]ntil the agency completes formal rule-making and promulgates final regulations"), cert. denied, 494 U.S. 1082 _____ ______ (1990); see also Sirkin v. Phillips Colleges, Inc., 779 F. Supp. ___ ____ ______ _______________________ 751, 755 (D. N.J. 1991) (declining to apply proposed Treasury regulation). Nevertheless, pending promulgation of final regula- ____________________ 7In enacting COBRA, Congress delegated responsibility for the issuance of interpretive regulations to three separate agencies: the Departments of Treasury, Labor, and Health and Human Services. See, e.g., 26 U.S.C. 7801, 7805 (Secretary of ___ ____ Treasury authorized to "prescribe all needful rules and regula- tions for the enforcement of this title"); 29 U.S.C. 1168 (Secretary of Labor authorized to "prescribe regulations to carry out the [continuation coverage] provisions"). To date, only the Treasury Department has proposed regulations under the statute. See generally Johnson v. Reserve Life Ins. Co., 765 F. Supp. ___ _________ _______ ______________________ 1478, 1480-83 (C.D. Cal. 1991) (discussing regulatory overlap in COBRA provisions). 14 tions, the Internal Revenue Service has announced that it "will consider compliance with the terms of these proposed regulations to constitute good faith compliance with a reasonable interpreta- tion of the statutory requirements." See 52 Fed. Reg. 22,716. ___ Accordingly, some courts have relied on the Proposed Regulations, notwithstanding their interim status, to define the scope of employers' duties under COBRA. See Branch v. G. Bernd Co., 955 ___ ______ _____________ F.2d 1574, 1581 (11th Cir. 1992) (finding that proposed regula- tions "represent the proper construction of COBRA in light of Congress' intent"); see also Lincoln Gen. Hosp. v. Blue ___ ____ _____________________ ____ Cross/Blue Shield of Nebraska, 963 F.2d 1136, 1142 (8th Cir. _______________________________ 1992) (Proposed Regulations show "regular practice" under COBRA); Communications Workers of America v. NYNEX Corp., 898 F.2d 887, __________________________________ ___________ 888-89 (2d Cir. 1990) (citing Proposed Regulations).8 Finally, our reading accords with the interpretation adopted by Congress in amending COBRA through the Miscellaneous ERISA Amendments Act of 1989. See H.R. No. 101-247, 101st Cong., ___ 1st Sess. 52 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 1944 _________ __ (under the original version of the statute, "[i]f the laid-off employee . . . elects continuation coverage, the maximum period of that coverage is measured from the date of the layoff, al- ________ ____ ___ ____ __ ___ ______ though the period an employer has to notify the employee that he ____________________ 8Moreover, we note that the Proposed Treasury Regulations are invoked, at various points, by both parties in their appel- late briefs. Cf. W.R. Grace & Co. v. United States E.P.A., 959 ___ _________________ _____________________ F.2d 360, 366 n.14 (1st Cir. 1992) (agency's interim, non-final regulations do not control appeal, but may be considered upon both parties' application "for the limited purpose of bolstering . . . analysis"). 15 or she has the right to elect continuation coverage does not begin to run until group health coverage is lost.") (emphasis added). Although the views of a subsequent Congress obviously are not binding in determining the intent of an earlier legisla- ture, see, e.g., United States v. American Heart Research Fund, ___ ____ _____________ _____________________________ No. 92-2108, slip op. at 8 (1st Cir. June 18, 1993); United ______ States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 ______ _________________________________________________ F.2d 20, 31 (1st Cir. 1989), "such views are entitled to signifi- cant weight . . . and particularly so when the precise intent of the enacting Congress is obscure." Seatrain Shipbuilding Corp. ___________________________ v. Shell Oil Co., 444 U.S. 572, 596 (1980) (citation omitted); _____________ see also United States v. Ven-Fuel, Inc., 758 F.2d 741, 758 (1st ___ ____ _____________ ______________ Cir. 1985); Roosevelt Campobello Int'l Park Comm'n v. United _________________________________________ ______ States E.P.A., 711 F.2d 431, 436-37 (1st Cir. 1983). As the ______________ accretion of evidence is compelling, we conclude that the Gas- kells' eighteen-month "continuation coverage" period ran from the date of the event which triggered David's loss of benefits under the terms of the Coop's group insurance plan, and not from July 1, 1988, when the Coop ceased its voluntary provision of employ- er-paid group plan insurance and the Gaskells' self-paid "contin- uation coverage" commenced.9 ____________________ 9We acknowledge the potential harsh effects of our inter- pretation, which effectively shifts to "qualified beneficiaries" the responsibility to ascertain when a "qualifying event" has occurred which would eventuate in the inexorable loss of a contract-right to coverage under the employer's plan even if that event precedes by days or months the actual loss of plan ______ coverage, the provision of notice by the plan administrator, and the commencement of any unexpired "election" period. See 29 ___ U.S.C. 1165(1)(A) ("election period . . . begins not later than 16 An important issue remains: whether, under the terms of the Coop's group insurance plan, David's loss of group plan eligibility inexorably was triggered by the commencement of his disability leave (January 14, 1987), by his resignation (January 14, 1988), or by some other event. It is the terms of the plan that matter in defining the appropriate "trigger"; thus, David's reduction in hours is not a "qualifying event" if it is not so designated in the plan, even if it might have been desig- _____ ____ ____ nated as such, and regardless of the fact that it may ultimately have led to the eventual occurrence of a "qualifying event" which ___ __ was so designated. See, e.g., Jachim v. KUTV, Inc., 783 F.Supp. ___ ____ ______ __________ 1328, 1332 (D. Utah 1992) (rejecting employee's claim that "reduction in hours" was a "qualifying event," where plan provid- ed no cessation of coverage until employee's actual termination). The record does not contain a copy of the Blue Cross ____________________ the date on which coverage terminates"). For example, if a "qualified beneficiary" of a plan which offers no conversion option fails to recognize the covered employee's reduction in hours as a "qualifying event," and no notice is provided by the plan administrator, the qualified beneficiary may find her continuation coverage abruptly terminated, some months later, with little or no time to arrange for alternative insurance. The Gaskells argue, with considerable force, that this result is inconsistent with COBRA's general remedial purpose, see National ___ ________ Companies Health Ben. Plan v. St. Joseph's Hosp., Inc., 929 F.2d ___________________________ ________________________ 1558, 1572-73 (11th Cir. 1991), to avoid sudden losses in cover- age. However, in the ordinary case, this sequence of events will be forestalled by the plan administrator's provision of timely notice under 29 U.S.C. 1166(a) ("In accordance with regulations prescribed by the Secretary . . . . (4) the administrator shall notify . . . any qualified beneficiary with respect to [a quali- fying] event . . . of such beneficiary's rights under this subsection"). Penalties may be enforced against plan administra- tors who fail to provide such notice. See id. at 1132(c)(1). ___ ___ 17 group insurance plan; and, with respect to the "triggering event" which led to cessation of plan coverage, the district court concluded that "there [was] no evidence concerning the Coop's policy with regard to the provision of benefits to employees on disability leave," see 762 F.Supp. at 1541 n.4. Since we may ___ uphold the judgment on the pleadings only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of __ ___ __ _____ [its] claims which would entitle [it] to relief," Conley v. ______ Gibson, 355 U.S. 41, 45-46 (1957) (emphasis added), and it is ______ impossible to determine from the present record whether going on full disability leave would automatically "trigger" a cessation of David's contractual entitlement to employer-paid group plan insurance benefits, cf. Charles v. Des Plaines Pub. Co., Inc., ___ _______ ____________________________ No. 91-C-01288 (N.D. Ill. June 4, 1991), U.S. Dist. LEXIS 7806, *5 (noting employee's failure to allege facts showing entitlement ___________ to group insurance during disability leave), the district court judgment was at least premature.10 We accordingly vacate the judgment, and remand for further proceedings. ____________________ 10For similar reasons, we decline to rule on the Gaskells' alternate argument, that principles of equitable estoppel require the Coop to provide "continuation coverage" under its plan for eighteen months beyond July 1, 1988. Even assuming that the defense of equitable estoppel is available to COBRA benefici- aries, upon a proper showing, where the terms of a plan are otherwise ambiguous, see National Companies Health Plan, 929 F.2d ___ ______________________________ at 1572-73, a preliminary showing of ambiguity is required; "'estoppel may not be invoked to enlarge or extend the coverage specified in a contract.'" See id. at 1572 n.13 (quoting Kane v. ___ ___ _______ ____ Aetna Life Ins., 893 F.2d 1283, 1285 n.3 (11th Cir.), cert. _________________ _____ denied, 111 S.Ct. 232 (1990)). Since the Blue Cross group plan ______ contract with the Coop is not part of the record, we cannot determine whether the ambiguity showing can be met here. 18 Since the remaining arguments raised by the Gaskells on appeal turn on the terms of the plan contract, and the validity of the district court's finding that "the Coop was . . . obligat- ed [under the terms of the contract] to provide health plan coverage to the Gaskells for a period beginning July 1, 1988," see 762 F. Supp. at 1543, appellate resolution of these issues ___ must await evidence of the terms of the plan contract, and district court reconsideration of the Coop's COBRA liability, on remand. We accordingly vacate the judgment, and remand for further proceedings. 19 The district court judgment is vacated and the case is ___ ________ _____ ________ __ _______ ___ ___ ____ __ remanded for further proceedings consistent herewith. ________ ___ _______ ___________ __________ _________ 20